v. SANDOZ INC. v. PHARMACEUTICALS May it please the Court, my name is DeAnne Maynard and I represent Appellants Sandoz and Mementa and Mr. Chaessler represents Milan, who is going to be presenting arguments from their brief. I'd like to focus my time on our indefiniteness and prosecution that a person of skill in the art would understand that one of three different average molecular weight are potentially at issue in the patents in suit. Peak, number, and weight average molecular weight. This difference matters because the special molecular weight range is key to the less toxic yet still effective copolymer one claimed in these patents. The district judge spent a lot of this marvelous opinion, a lot of effort on this, and they said a person of skill in the art would look at the graph, figure one, be able to figure out where those peaks are, and you're going to get to prosecution history in a moment here, but he said that was just a mistake, the first statement was just a mistake. Why aren't, why isn't that enough to render this definite? Well, let me address the expert first. Okay. Because, as an initial matter, this Court has repeatedly, and as recently as last month, held that whether a claim is indefinite is a question of law. But, of course, one can look at an expert to help explain the extrinsic, can use it as extrinsic evidence, but under Phillips, intrinsic evidence is still the key. And when you look at Dr. Grant's declaration, even by his own math, figure one, which is key to the district court error, the district court says figure one points to peak. Dr. Grant says figure one points to peak. But the legend in figure one says the average molecular weight of these curves is 7.7 and 12. Dr. Grant says the peak is not that. By his own measurements, Dr. Grant measures the peak at 6.8 and at 10, which is a significant margin of error from the information in the grant. By his own calculations, Dr. Grant calculated both number average molecular weight and weight average molecular weight from the data in figure one. And significantly, the number he came up with, weight average molecular weight, is closer to the numbers in the legend than his numbers for peak. Yet he chooses peak. And, in fact, his declaration says he assumes it's peak because his numbers for peak are close to those in the legend. But his numbers for weight average molecular weight are closer to the numbers in the legend. But he goes on to explain we're at a very high level of skill in this art and that a person with ordinary skill is going to be able to adjust that and make it work. But there's no support in the intrinsic record, Chief Judge, for the fact that there's any error in the graph. So that's the kind of expert testimony that this court doesn't accept, which is the ultimate question of what does the specification mean is a question for the court. Regardless of whatever standard of deference you apply. Counsel, there are patents directed to group one claims and group two claims. You follow me and know what I'm talking about, right? There are three different kinds of claims. Okay, but group one claims and group two claims. Two different sets of claims. The group two claims are the 75% claims. Do you now follow me? Yes, I am with you. So the group two claims have the limitation copolymer one having over 75% of its molecules within the molecular weight range from about two to about 20. That is not a claim that covers average molecular weight at all. It's not asking for MW, MP, MN, or anything else. I guess there are four types. I don't remember number four. M something else. So it's not asking for any of those. It's looking at every one of the individual pupils. 75% of them have to be within this range. So it's irrelevant. There is no MW or MP there. So why is that claim term indefinite? Because when you're talking about this copolymer one, all of the weights are necessarily averages. And even Dr. Grant can see this. Copolymer one having 75% of its molecule within the molecular weight range from two to 20 kilodalton. That's each individual molecule. That's not 75% of each of the individual molecules. Not average. That doesn't make sense when you're talking about each one. Dr. Grant, even some of the other claims, I think you're calling the group one claims. I'm calling these group two claims. Group one claims would be the ones that actually turn on average molecular weight. Yes, but even those claims say a copolymer having a molecular weight of four to nine. And Dr. Grant said that all... No, that's different because that's a copolymer. So you're talking about the average of all the molecules. But this one actually says 75% of each molecule, 75% of all the molecules have to be within this. That's not an average. I mean, it's simple mathematics. This isn't complicated chemistry because otherwise I wouldn't get it. So 75% of the individual molecules have to be in this range. So molecular weight and any indefiniteness about NW or NP is irrelevant to these claim terms. So I don't see any indefiniteness argument for these. Well, the indefinite argument is that when you separate species, you ultimately, no matter how thin you slice the species, and Dr. Grant testified to this, no matter how thin you slice it, you're always going to have a mix of different sized molecules in each slice. And therefore, you're necessarily talking about an average. And so even with respect to the two kilodaltons, the 20 kilodaltons, where you're talking about the species, and I do agree with you, you're still talking about an average. And at the margins between two and 20, it will make a difference which type of average you're talking about. And so it is indefinite. But even if the court thought there was a distinction that one could draw between these different claims, the ones that you're calling the group four claims, Your Honor, would be... Group two. No, I'm now talking about the four-to-nine and the five-to-nine claims are indefinite because a person of skill in the art can't discern from this pattern. But I guess here's my problem. If I don't agree with you that the group two claims are indefinite because we're talking about 75% of the total area under the curve, and it seems like it's pretty definite to me, then it doesn't matter whether the group one claims are or not because the district court made a separate infringement holding on this basis, which I can look up and point to in the record because I had my clerk look this up. So the entire thing is an affirm. It's the bottom line because you've got an injunction here. That's all this is about is an injunction. It's not about damages. So the injunction stands if any of the claims are infringed. No, Your Honor. With respect, the 808 patent has a longer expiration date, and the 808 patent has one claim, and it's what you're calling the species one type of claim, and it's invalid under our indefinite argument, and it does make a difference. In addition... Okay. So what you're telling me is even if I absolutely dug my heels in on these group two claims, that I still need to look at indefinite for the group one claims because the lengths of the term of the injunction will be affected by the group one claims because that's the longest life patent. Is that right? Yes, Your Honor, and also some of the other claims, some of the other claims which are in orange book patents, which would also make a difference because the longest running patent is not an orange book patent, and so the patents that have claims that only contain the four to nine and five to nine are indefinite under an argument, and even if you draw a distinction, those claims should be held invalid, and it will make a difference. So it does matter. And we do think that if there ever is an indefinite claim, these are they. It's just like Honeywell. They're trying to add in information that isn't there using their experts, and they're relying on the expert to trump the intrinsic evidence that is there. The evidence that is there says the average molecular weight in figure one is 7.7, and their expert says, no, it's not. It's 6.8, and Phillips is clear. The expert can't be used, whatever he's used for, to trump. I would like to touch on the prosecution history disclaimer because even if one draws a distinction, Judge Moore, for purposes of indefinite, the prosecution history disclaimer argument goes to all the claims because they made the statement in all types of patents. So they made the disclaiming statement in the molecular weight profile patent. They made the disclaiming statement in patents with the group two type claims that Judge Moore is referring to. Can't they correct that with their second statement? The prosecution history disclaimer, Your Honor, I've switched arguments now. Yeah, I'm with you. Can't they correct the mistake that they made that you say sets up an ambiguous dichotomy? Can't they correct it by making a second statement? No. I was trying to move on to my second argument, but with respect to indefinite, it's no. This court's case law makes both of those prosecution history statements relevant, and they can't correct it. And the reasoning given for the second answer, Your Honor, the peak answer in the prosecution history is just as questionable as the answer that they gave, the explanation they gave with respect to the first prosecution history because it points to figure one, which doesn't show peak in the legend. But, Your Honor, I was trying to make the point that they repeatedly and unequivocally disclaimed the weight range in the 550 patent in order to get these new patents on their new copolymer. And whatever else these patents claim, none of them can cover a weight average molecular weight of 10 or more kilodaltons because they repeatedly gave up that to get this coverage. If I can save what little time I have left for rebuttal, I'd appreciate it. Okay. Thank you.  Good morning, Your Honors. I please the court. My name is Evan Chesler. I represent Mylan. I want to focus this morning on only one issue in the brief time I have, and that's the non-infringement issue. Judge Moore, in a different context, just said something with simple mathematics here. That's the only kind of mathematics I can understand, and that's what I'm here to point out the court below erred with respect to. It's pretty unusual where you, in fact, I can't think of another case where you suggest that a bioequivalent doesn't infringe. Well, Your Honor, it may be unusual that a bioequivalent doesn't infringe. I agree with that. But there is, in this case, a very, very simple reason upon which the district court made a clear error. Regardless of the review standard that's applied, whether you look at this as a de novo standard because it's a claim construction or a factual mistake, we get to the same place, and it has to do with one word, and that's the word approximately. And the mistake the district court made is how it compared two ratios. And if I can, I'd like to use an analogy to try to make the point. I want you to assume, Your Honor, that there's a model that predicts what the percentage of people in America is will have each of four eye colors, brown, hazel, blue, and green. And the model tells you that the ratio of those people will be 6 to 2, to 5 to 1. And when you do the percentages, you come out with exactly the percentages that the district court came out with, which are captured on page 31 of our main brief in a table that we've prepared. Now, assume you just take 1,000 people off the street, and you look at them as a sample, and you determine whether their distribution of eye colors is approximately the same as what the model says, the percentages that the district court calculated, which are 42.9 and 14.3, etc.,  which is the total of those numbers in the ratio, and divided each one by 6, by 2, by 5.1. Now, suppose, Your Honor, that it turns out that in 1,000 people, your model says, just as the judges' ratio did, that you'd have 429 brown-eyed people, which is the alanine ratio. And in fact, what happens in your sample is you have 427. It's a tiny difference. It turns out it's 2 tenths of 1%. Suppose for the hazel-eyed people, the model says 143 out of 1,000, which is 14.3%, you have 144, a small difference, 0.1%. For the blue-eyed people, the model says you should have 357 people out of 1,000, and in fact you have 336, 21 less than the model predicted. It's a difference of about 5.5%. And lastly, green-eyed people, the model says you'd have 71, in fact you have 92. Now that's a 30% difference. The mistake the district court made here was it added the difference in percentages as if they were absolute numbers, and said, well, the difference for the blue-eyed people is 2.1 percentage points, even though it was a difference of 21 people off of a base of 357. And the difference for the green-eyed people is 2.1 percentage points, even though it was a difference of 21 people off of an expected number of 71. Those are simply not the same, Your Honor. Those 21 people represent a huge difference off the small base, and a very small difference off the big base. And yet what the district court did was a simple mathematical error. She added up all those percentages and said, it's only a 4.5 percentage difference among all of them. And that's not a big difference. I'm not sure that the analogy holds. Does it have any functional difference? Yes, it does, Your Honor. It has functional difference, and I want to make a couple of points for why it's a functional difference. First of all, the tyrosine, which is the one amino acid for which there's this dramatic difference, this 30% difference, tyrosine is in fact very difficult, relatively more difficult to dissolve in water. And in this circumstance, if you vary that one amino acid by 30%, it could have an effect upon efficacy. Yet the court never got to that.  It can be a bioequivalent, Your Honor, but if it has too much of that material in it so that it has an effect upon the environment in which it sits, which is water, it could have an effect upon the efficacy, even if it is bioequivalent in terms of registering it in the Orange Book. The question here is not whether it's bioequivalent for Orange Book purposes. The question is whether it's an infringement under the patent claim. And I would submit to Your Honor that the word approximately has to mean something. Now what did the district court do when she erroneously added up all these percentages and said the total of the percentage differences is 4.5? She said, let me find an example that has the greatest difference when you add them all up. And it's a particular example in the title bound reference, which is incorporated in the patent. She said, the biggest difference there is lysine, it's 12%. 4.5 is less than 12, hence it must be approximate. Well, if she had done it the correct way, if she had looked at each of the amino acids and found, which the numbers plainly show in eighth grade mathematics, that there's a 30% difference for tyrosine, if she had gone to exactly the same example in exactly the same publication, the batch two in title bound, she'd have found that the difference there is only 16%. And I would submit at a minimum the district court has to reconsider on remand whether a 30% difference for tyrosine is, quote, approximately the same as that ratio when in fact the greatest difference in the record here is 16%. Remind me, did the district judge do that on her own or was that following a formula that was presented by your opponent? Following formulas presented by our opponent. So it wasn't something she just dreamed up. No, no, no, your honor. Doing what judges do, that's listening to both sides and trying to pick one. And if one, yes, your honor, I agree. And if one side proposes something that's mathematically wrong and the district court follows it, it's clear error. And you think that's a question of, that's not a question of fact? I think, well, frankly, I could argue either one. You could go either way. I could go either way, but let's assume. I think I like that. Thank you, your honor. Let's assume, for purposes of this argument, it's a question of fact. The alternative argument, which we've made in the brief, and I think it's a credible argument, is the word approximately must be understood in order to interpret the claim, because it says a ratio, it calls it copolymer one, and the spec defines it as approximately six to two to five to one. Well, the district court, though, used prosecution history in reference to other references to figure out what approximately meant. Why is that erroneous? I mean, that's exactly what one of Skilnert would do here. Exactly, your honor. So let's take it as a question of fact in answer to Judge Benson's question. Say it's a question of fact. Is it clearly erroneous? Because if you look at the very reference the district court went to to determine whether on her erroneous methodology of comparison the answer was approximately the same, she got approximately the same. She got 4.5 is less than 12%. It's approximately the same. What I'm saying to your honors is, go to exactly the same reference, but instead of making the mathematical mistake she made, look in fact at the fact that when there's a 21 unit difference on a base of 7.1%, it's a 30% difference, not a 2.1% difference, and say is 30% close enough to be approximate? Go to exactly the same reference, batch two and title bell, and you'll see that for tyrosine, the difference which is the biggest difference of any reference that's incorporated in the patent is 16%. And I would submit to your honor that therefore under her own methodology of finding what is approximate, it would have been a completely opposite result and hence non-infringement had she not made that one mathematical mistake. Let me make one more analogy if I may, and then I'll stop. I live in a small town in Westchester County in New York. If I ran for mayor of that town and I won by 1,000 votes, it would be a landslide. If I ran for the governorship of New York and I won by 1,000 votes, there'd be a recount. That's the mistake the judge made. 2.1% is not the same if they're off of completely different bases. Does the difference in myelin's product really mean one amino acid? No, your honor, because the size of these molecules, in fact, vary enormously. And some of them are huge and some of them are smaller. They picked one as an example to make a very good rhetorical point. But in fact, if you look in the real world at the actual drug, some of them are enormous numbers and the differences are much, much larger than that.  I see that I'm within my... One amino acid. It's not one molecule of the amino acid. In fact, it depends upon which particular version of it you look at and there are many and some of them have huge numbers but that same difference of 29.6% could be an enormous number of difference in molecules. But you agree that under statements made in the prosecution history your product would infringe. If the statements made in the prosecution history are the way to properly consider what approximately means, then your product infringes. No, your honor. Respectfully, I disagree. Really, on pages 35 and 36, I thought that you basically agreed. No, your honor. If in fact, the comparison were done correctly, by the way, in the prosecution history... No, I'm not saying done according to your preferred methodology. I'm saying done according to the statements that they made in the prosecution history to further define or explain what this ratio should mean. Your honor, even under that standard, they would not. Until the trial, Teva had never in fact calculated the ratio other than by normalizing to the lowest populous amino acid, which in this case would be tyrosine N1. The first time they used the methodology that they proposed to calculate the ratio was at the trial. So under the prosecution history, it would not, in fact, have been infringed. Thank you, your honor. Thank you, Mr. Chesler. Ms. Pollack. May it please the court. I'm going to start with the point that Mr. Chesler just left off with. It's my land's position in this case that there is a 30% difference in tyrosine and that's the way you should assess infringement. And, you know, we agree with the district court that's not the right way to look at this issue. This is a composition. You have to look at all the components. But even assuming Mr. Chesler was right about the 30%, the district court had a specific factual finding after hearing all the evidence in the case that any difference in a single amino acid, even up to 40%, would be approximately the same to a person of ordinary skill in the art because that is the error associated with amino acid analysis. That's the time frame 1994. Dr. Kent, my land's expert below, said the right way to look at the term approximately is to figure out what the error associated with amino acid analysis was. The district court didn't agree with that but said I'm going to look at the issue with that framework anyway and made a specific finding that anything in the range of 20% to 40% would be something that the person of skill would assume was within the meaning of approximately. There's an additional reason why Mr. Chesler's argument can't be right, Your Honor. It has to do with the process that's given in the patent for making copolymer 1. Dr. Kent, again, my land's expert below, conceded that if you follow the process in the patent using all high-quality reagents, using high-quality HBR, you're going to get something with my land's amino acid molar ratio. It cannot be that you follow the process in the patent, you get exactly what my land gets, and then my land's product is not approximately 62 to 521 and is not copolymer 1. Finally on this point, Mr. Chesler mentioned page 31 in my land's brief, table 3. I think if you look at that chart which shows the molar fractions of my land's product versus the molar fraction in a sample that would be exactly 62 to 521, it's striking how the two are almost exactly the same and certainly it was not clearly erroneous for the district court to find that they were approximately the same. I'm going to turn now to the indefinite mis-argument. A claim can't be held invalid for indefiniteness unless it's insolubly ambiguous. The district court here, in a very thorough opinion, found that the term average molecular weight would not be insolubly ambiguous to the person of ordinary skill in the art. And she approached the issue exactly as this court's precedent told her to. The words average molecular weight in a vacuum would be ambiguous, right? Because it could be any of, I think it's four, different measures for molecular weight average. Is that correct? Yes, Your Honor. If you're looking at average molecular weight with no context, without the specification prosecution history, it could mean many different things, but we're not doing that in this case. What the district court found is that a person of ordinary skill in the art here, high level of skill in the art, PhD in chemistry, a lot of experience in science exclusion chromatography, when they look at the specification and they see that the technique you're supposed to use to determine molecular weight here is science exclusion chromatography, that tells them something very important. It tells them that they should assume that the average molecular weight means peak. It's true that you can do manipulations and calculations and eventually get to weight average or number average, but the data that you get from an SEC chromatogram directly is just peak molecular weight. How do you reconcile the two contradictory statements in the prosecution history? Are you asking us to just let the first one be a mulligan and only the second one counts? It doesn't count in professional golf, does it? I guess not. I'll take your word for it. No, what I would say about that, Your Honor, is that the person of ordinary skill, when he gets to look at the prosecution history, comes in with the assumption based on the specification we're talking about peak average molecular weight here. He gets to the prosecution... What is the assumption based on the specification? Why is it... What is the assumption you said starting with the... That average molecular weight means peak average molecular weight. No, why? Why does one of skill in the art reading this specification think that? Because the person of ordinary skill in the art, when they see the technique of science exclusion chromatography, that tells them that it's peak average molecular weight unless they're exclusively told otherwise. And where is your evidence of that? That was in Dr. Grant's declarations, Your Honor. He says that because they say size exclusion chromatography in the specification, that tells somebody it is peak molecular weight. Yes, because we're talking here not about a lay person looking at the specification. We're talking about a person of skill in the art, and the specific identification of the technique to use tells them what they should assume average molecular weight means. And that's what Dr. Grant said in his declarations that explain quite clearly. Was this contested that once it mentioned SEC, it was automatic, everyone knew what method you were using? It's not contested that when a person of ordinary skill in the arts has an SEC chromatogram, the only thing they can get from that chromatogram without further mathematical manipulations is the peak. That's not contested. Excuse me. Proceed. Well, then in the prosecution history, the first time you say a person of skill in the art would use weight average molecular weight, how does that square with what you just told us about the spec? Yes, Your Honor. So when the person of ordinary skill in the art comes to the prosecution history, they already have the assumption in mind based on the specification this means peak. So when they get to the prosecution history, they see two statements. They see a statement in the 539 prosecution history, a definitional statement. It says average molecular weight means peak, and that is completely consistent with and confirms what they would have already understood based on the specification. They get to the statement in the 847 prosecution history. First of all, it doesn't make sense in the context of the rest of the intrinsic evidence, which points to peak. But in addition to that, there is no dispute here, and Sandoz expert below conceded it is a simple scientific error. The statement is, a person of ordinary skill in the art could understand that kilodalton unit implies weight average molecular weight. That's just wrong as a matter of science. Kilodalton unit is nothing. It's just a unit of measurement like the inch. It doesn't tell you anything about the type of average molecular weight that's being discussed. So in the context of the intrinsic evidence as a whole, the specification, which is telling you peak, 539 prosecution history, which is telling you peak, the person of ordinary skill is not going to be confused by an erroneous statement in the 847 prosecution history. I'd like to address Ms. Nader's comments about figure 1 in the specification, because I don't believe Dr. Grant's opinions there were stated clearly. What Dr. Grant said is, the person of ordinary skill in the art, they've already seen the reference to SEC in the specification, which is telling them this is peak. But a person of skill in the art can calculate MW with SEC also, so I just don't understand your argument that SEC means only peak. It doesn't. A person of skill in the art, that's how they calculate MW also. Correct, Your Honor, it can be calculated, but the point is that a person of ordinary skill in the art, the only data that they get directly from the chromatogram is peak, so unless someone is telling them that you're talking about a different kind of average molecular weight, which of course could happen. The only thing they get is peak. The problem is the figure that you have in the patent, the number on that figure doesn't correspond to MP. So one of skill in the art looking at that is going to say, hmm, in chemistry, especially when you're talking about these sorts of things, it seems to me that precision is important. And, Your Honor, any technique you use in science is going to have some error associated, some lack of precision. When the person of ordinary skill gets to Figure 1, what Dr. Grant explains clearly is not exactly what Ms. Maynard said. Figure 1 is not itself an SEC chromatogram. It's based on data that's transferred from an SEC chromatogram. In the process of transferring that data and making a new graph, you would expect that the peaks to shift a little bit, and I can explain to you in a little more detail how the transfer takes place, but it's in Dr. Grant's declaration. And the number is what, 6.6? Is that right, 6.6? I don't remember what the number was. What's the number? 7.7 and 12, but they're shifted off. They're shifted a bit. 6.8, aren't they? And it's actually closer to MW than MP, correct? Actually, Dr. Sandow's expert below said you can't even calculate MW from Figure 1. It's not possible. That's not what the person of ordinary skill in the art is doing when they look at Figure 1. What they're doing when they get to Figure 1 is confirming whether or not their understanding of peak from the specifications use of size exclusion chromatography is correct. What they see are the peaks in Figure 1 about where they would expect them to be based on the process of transferring the data from the SEC chromatogram to Figure 1. When you transfer the data, you do it from the chromatogram in slices. This is explained in Dr. Grant's declaration. The process of transferring the data results in a shift peak. That would be understood by the person of ordinary skill, and that is why it's critical here to look at the specification from that perspective, not as a layperson. What would the person of ordinary skill in the art understand about Figure 1? But Ms. Holland, my concern is that the examiner raises this issue and says they presumably have skill in the art. They see that it's SEC, and they raise the issue that there's some indefiniteness here. And your response to them is, oh, use average weight, molecular weight, not use the peak. Doesn't that send everything off-kilter? No, I don't believe it does, Your Honor. Again, I think the person of ordinary skill in the art is approaching this just like the court is supposed to approach it, looking at all the intrinsic evidence together. The person of ordinary skill in the art sees the 539 patent, which teaches peak, which is what they would have understood from the specification anyway. They get to the 847 prosecution history, and there's no dispute. It's a clear scientific error. There's no reason for the person of ordinary skill in the art to say, I'm going to take that clear scientific error and assume that that's what was meant by error. What is a clear scientific error? I'm sorry? What's a clear scientific error? The statement in the 847 prosecution history says a person of ordinary skill could understand from the use of the kilodalton unit that average molecular weight is weight average molecular weight. That is not correct scientifically. The kilodalton unit doesn't speak at all. No, kilodalton is the unit of measure for any of them. I get that. But SCC can be used to determine any of them too. So I just don't get how you can have it both ways. You made the statement, the examiner said, ambiguous, because I can't tell whether you want MWMP or some other M. You guys come along and say it's MW. There's no other way to interpret this sentence because this overcame that rejection. Immediately after this, those claims were allowed. This is the only statement you made that was responsive to that rejection. So you have to, one of the skill in the art has to walk away from this prosecution with the understanding that you're referencing MW. There is no other way to read it. So they're walking away with that understanding. So then the question is, can you overcome that by coming along later and correcting it, or does this only add to the indefiniteness? That's the question. You're never going to convince me that this statement doesn't mean you have said it's MW. So get to the next point and try and convince me why I should say it's not indefinite after you said it's one thing to get one patent and then said it's a different thing to get a continuation later on down the road. Well, Your Honor, I mean, we start off with the premise that because this is an issued patent, it has a presumption of validity, and it has to be insolubly ambiguous in order to get past that presumption of validity. In this case, you have a lot of evidence, from the intrinsic evidence, teaching you that it's P. Regardless of whether you say that there was some piece of evidence that teaches away... You know, the same examiner was on both of these, which really cracked me up. Mr. Kraut, the same examiner was on both,  At both times, you were saying that one of the skill in the art, based on this specification, would know it's M.P., but both times, he rejected all of these claims, saying, I can't tell from this specification whether it's M.P. or M.W. He was quite clear. So... Well, the fact that there was a second rejection, Your Honor, after the initial one that had the statement about weight average molecular weight, trust me, it's not lost on me. The fact that he rejected you again after you said M.W. the first time, he obviously forgot. I don't know. I don't know what else to attribute that to. It could be attributed, Your Honor, to the fact that the statement that M.W. could be undisturbed from the kill-adulting unit is just not right and doesn't make sense. Well, he allowed that patent. That patent issued, and you enforce it. Correct, Your Honor, but it's... So it's not the fact that he looked at that statement and concluded that was inadequate. He allowed it, and you enforce it. The second statement in the 539 prosecution history is the one that would comport with the understanding of the person of ordinary skill in the art based on the specification. Really? Because the second statement in the prosecution history strikes me as ambiguous and confusing as the first. Accordingly, the term average molecular weight is... Oh, I'm sorry, I'm reading the whole rejection. One of ordinary skill in the art primary investigation would understand that average molecular weight refers to molecular weight at the peak of the molecular weight distribution curve shown in Figure 1, which is the percentage of total mass versus molecular weight. Figure 1, the average molecular weight is 7.7. The problem is, that's not right. Molecular peak weight is 6 point something. MW is closer to 7.7. So I think one of skill in the art would be as confused by that second sentence as they were by the first. The only evidence in the record before this Court about what the person of ordinary skill in the art would be able to understand from the specification is Dr. Grant's declaration. But the numbers don't lie. 7.7 isn't MP. So if you have some expert that says, oh, one would understand 7.7 is MP and everybody in the room knows 7.7 isn't MP, I mean, what am I deferring to him for? You were deferring to him, Your Honor, for an understanding of what Figure 1 is, what it's meant to represent, and how it relates to the SEC chromatogram that's the original data that comes from the use of the size exclusion chromatography. There is no expert on Sando's side disputing that you would have a shift in the peaks, Your Honor. There's nobody on Sando's side saying from an expert perspective, I disagree with Dr. Grant, you wouldn't expect that peak shift. That is the evidence in the record of what the person of ordinary skill in the art would understand about Figure 1. There's no basis in the record to dispute that on anybody's part. It's a scientific matter based on a high level of skill in the art here. Well, you say there's nothing in the record except the fact that the examiner rejected it despite that disclosure twice and one time you said M.W. and the next time you said M.P. Guess what? Maybe the spec wasn't ambiguous until you guys started answering all those rejections and you made it so by going one way once and the next way the next time. I don't know. I mean, it's just hard for me to reconcile how one of skill in the art is supposed to walk away from this prosecution history with a clear understanding of what you all mean. As I said, Your Honor, the way to do that is to look at the intrinsic evidence as a whole. The person of ordinary skill in the art comes in with the assumption it's peak when they read the prosecution history, when they see the statement in the 539 prosecution history, that confirms what they would understand based on the specification, Your Honor. Just to touch briefly on the prosecution history disclaimer argument that Ms. Maynard touched on briefly. The claims at issue here have a molecular weight range of 5 to 9 kilopaltins. The prosecution history statements that Sandoz points to are about 10 kilopaltins copolymer 1. They don't have anything to do with the literal scope of the claims as issued. But even if they did, there is nothing in the prosecution history that would tell the person of ordinary skill clearly and unambiguously that the references to 10 kilopaltins copolymer 1 would refer to weight average molecular weight copolymer 1. There's just nothing in the prosecution history itself. What Sandoz does is construct a very elaborate daisy chain going from the prosecution history to the 550 patent, which itself does not talk about any particular kind of average molecular weight, to the 71 title bound paper, which is not incorporated by reference in the 550 patent, it's just cited in the prosecution history of the 550 patent. Go from there to the 71 title bound paper's reference to a sphinco-e ultracentrifuge and make the argument that that reference in the 71 title bound paper would somehow be a clear and unambiguous disavowal of claims of weight average molecular weight. It's just too far from clear and unambiguous to be a disclaimer in this case. In addition, even if you did that whole analysis, it would ultimately fail because the ultracentrifugation can give many different kinds of average molecular weight. In addition to weight average molecular weight, that's what the district court found as a matter of fact and her conclusion should be affirmed. Any more questions? Or else I'll stop here. Mr. Maynard, you have 16 seconds. Speak quickly. Both of our arguments are about notice. Notice about what these patents cover. Talk about the SEC stuff because that to me is a very compelling argument on her point. Well, as you correctly note, SEC can get you one of three different types. No, one can be read off the graph, right? The rest have to be calculated. But there's no basis to assume that one of these very highly skilled artisans is going to take the easiest path and what Ms. Collins ignores is the title bound article which is incorporated by reference in these assertive patents which everyone agrees shows a method that doesn't get peak. The Finko Model E Ultracentrifuge we say only gets weight and that's what the testimony shows but no one says it gets peak. Not sure that's incorporated by reference. It is cited. It's not incorporated by reference in the 550 patent, Your Honor, but it is indeed incorporated by reference in the very first column of the specification of all the assertive patents here. And so when one's trying to figure out what the assertive patents cover, one would look to the title bound article and the title bound article says that the weight in that article and the article's written by three of the named inventors of the assertive patents here describes the 550's invention as being measured by ultracentrifugation and all the experts agree that doesn't get you peak. So it points away from peak. If this is so insolubly ambiguous, why did a district court after hearing five weeks of testimony find it to be otherwise? No, Your Honor. She found it to be not indefinite before the trial. After a claim construction hearing... Went all the way through the trial, heard everything. If she thought she'd made a mistake, she would have corrected it. This wasn't an issue at the trial, Your Honor. The trial, we preserved our objection. The trial presumed, proceeded on the assumption that it meant peak and this issue was not revisited. So this was decided on papers only, on argument, and what she essentially did is use the expert to trump the intrinsic record which points nowhere in terms of peak, in terms of what the average molecular weight means. Are you saying the statement in the spec, all references cited herein are incorporated by reference in their entirety, gets you title bomb and gets you molecular weight MW? Because we have a lot of case law. I don't see another incorporation by reference. Am I missing it? Maybe column one contains an express incorporation of title bomb or a particular thing for which it stands. I'm looking at column one and the only place where I see the word incorporation by reference are in a sentence that says all references cited herein are incorporated by reference. Ms. Maynard, under our case law, if I'm mistaken and it appears somewhere else, please direct me to it, but under our case law, we've held that statements like this, I believe, are not enough to incorporate specifics and references into this one because this has too much generality. It's like, why wouldn't every patent say that all the time then? You have to incorporate by reference with specificity with a particular component. The line preceding where you're reading, Your Honor, line 14, that is the title bomb article, the 1971 article in two lines above where you are. Okay, I'm on 847, so am I in the wrong patent? Oh, I'm sorry. If you look at A344, I'm in the 808, the first issued patent, but all the specifications are shared. 808? The 808 patent. I'm looking at A344. Okay, I'm on the 808 patent. What line? 14. I'm at line 14. See the Your J. Immunol, 1971. Yeah, but that doesn't say anything about incorporating by reference. Then the very next sentence, all references cited herein are hereby incorporated by reference. Yeah, there's no reference to that title bomb reference or worth a particular form of specificity within title bomb. Title bomb, isn't that three-volume treatise? Am I mistaken? Is that really, is it the long one? Hello? Someone's answering me, nodding his nod. Title bomb, what, you just going to get everything in automatically? Title bomb is, no, title bomb is, title bomb is reprinted      it says on A49040, it says on A49040, it says on A49040, it says on A49040, it says on A49040, it says on A49040, am I understanding wrong of incorporation by reference law, Ms. Maynard? I'm sorry, we'll weigh over, but yes or no, don't you have to incorporate by reference with specificity? My understanding of your incorporation by reference law, which is cited in our briefing, is that things that are items that are incorporated by reference are incorporated in toto as if written in the patent itself. But even beyond that, Your Honor, if the person still in the yard sees FEC, knows that can, that can give you at least three different references, there's no reason to assume this person in the yard is going to do the easiest thing and they're trying to figure it out. They're going to look at this article written by three of the names inventors of the assertive patents and see how they were measuring it. And it points away from FEC. Okay, thank you, Ms. Maynard. Thank you. Thank you for your indulgence. First time anybody has said I'm indulgent. So I have 16 seconds. Mr. Kessler, you have 16, no, just seconds. You have, you better start. I better start. Your Honor, counsel with respect was incorrect when she said that Mylan uses the patented process and therefore must get a bioequivalent result. Neither Mylan nor Teva uses that process. They both use the process of a separate patent, Dolitsky, which appears in the record at A32668 and following. And indeed, Teva went and got a patent on a process that fixed the problem by adding phenol. That fixed the fact that you lose 30% of the tyrosine which creates the discrepancy which the district court missed by doing the wrong mathematical calculation. So in fact, counsel was wrong when she said that we both practiced the process that's in the patent. Okay. Thank you. Thank you, Your Honor.